# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| KAMEN PRICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:10cv1431 TCM |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the application of Kamen Price for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Kamen Price (Plaintiff) applied for DIB in December 2007, alleging he was disabled as of October 15, 2006, by a bad back. (R.[1] at 86-93.) His application was denied initially and after a hearing held in August 2009 before Administrative Law Judge (ALJ) Michael D. Mance. (Id. at 8-52.) The Appeals Council then denied Plaintiff's request for review,

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Brenda G. Young, M.A., testified at the administrative hearing. Plaintiff's wife was present but did not testify.

Plaintiff was 29 years old at the time of the hearing. (Id. at 25.) He lives in a house with his wife and two sons, one of whom is eleven years old and the other is almost two. (Id. at 26.) He finished the twelfth grade. (Id. at 25-26.)

Plaintiff tried to return to work after his first back surgery, but his job had been filled by someone else. (Id. at 26.) He then had a second back surgery. (Id.) He applied for unemployment in the last two quarters of 2007 and the first in 2008. (Id. at 27.) He did this because he had no other source of income. (Id.) He has a worker's compensation claim pending. (Id. at 28.)

Asked what keeps him from working, Plaintiff explained that it is the constant pain in his back and the poor circulation in his legs. (Id. at 29.) His average pain is a six; it fluctuates between a four and seven. (Id.) He takes Vicodin for pain, Zoloft for depression, Flexeril as a muscle relaxer, and Xanax to help him sleep. (Id. at 29-30.) The pain makes it hard for him to sleep. (Id. at 30.) He sleeps between four to six hours a night and constantly wakes up. (Id.) He regularly uses a heating pad to help relieve his pain. (Id. at 36.)

During the day, he cares for his youngest child. (Id. at 30.) He keeps him confined to a couple of rooms so Plaintiff can control him without hurting himself. (Id.) Sometimes,

he has to play a movie for his son so he can relax. (Id.) Sometimes, his depression makes it hard for him to care for his son. (Id. at 33.) Because of his back problems, they do not go to the playground or play outside. (Id. at 35.) He cannot physically play with his son as his son would like. (Id.)

Plaintiff smokes six cigarettes a day. (Id. at 30-31.)

He can walk for five to ten minutes before having to stop and rest. (Id. at 31.) He can stand for ten or fifteen minutes at a time and sit for twenty before having to move. (Id.) He can lift and carry twenty pounds at most. (Id.) He drives to doctors' appointments. (Id.) He goes shopping with his wife and holds on to the cart for support. (Id. at 32.) He cannot stoop or crouch. (Id. at 35.) If he drops something on the floor, someone else has to pick it up. (Id. at 35-36.) The pain interferes with his ability to concentrate and pay attention. (Id. at 38.)

His depression is caused by his physical problems. (Id. at 33.) He has a crying spell daily. (Id. at 38.)

Ms. Young testified as a vocational expert (VE).

First, she classified Plaintiff's past work as an auto body painter as semi-skilled with a medium work demand as listed in the Dictionary of Occupational Titles (DOT) and as heavy to very heavy as performed by Plaintiff. (Id. at 40.)

Next, the ALJ asked her to assume a hypothetical claimant of Plaintiff's age, education, and work experience who was limited to performing work at the light exertional

level[2]; who needed to rotate positions frequently; who could occasionally climb stairs and ramps but never climb ropes, ladders, and scaffolds; who could occasionally balance, stoop, kneel, crouch, and crawl; who should avoid concentrated exposure to unprotected heights, excessive vibration, and hazardous machinery; and who, because of pain and mental health issues, was limited to unskilled work. (Id. at 40-41.) Such a person could not perform Plaintiff's past relevant work. (Id. at 41.) Such a person could, however, perform a file clerk job and a retail sales job, both of which existed in substantial numbers in the local and national economies. (Id. at 41, 42.) Also, some security jobs are unskilled as actually performed although the DOT lists them in the lower end of the semi-skilled range. (Id. at 41.) These exist in significant numbers in the local and national economies. (Id. at 41, 42.)

If this hypothetical claimant was limited to sedentary work[3] with the same additional limitations and with the need to use a cane to ambulate, that person could not perform Plaintiff's past work but could do some cashier and telemarketing jobs. (Id. at 42.) Of the former, there were approximately 800 and of the latter there were approximately 2500 in the local economy. (Id.)

If this hypothetical claimant also needed to have occasional unscheduled disruptions in the work day and work week due to pain and needed to lie down for an extended period, there were no jobs this person could perform. (Id. at 42-43.) Nor would any of the jobs she

---

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

[3]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing." 20 C.F.R. § 404.1567(a).

cited be able to be performed by a person who could not twist, bend, stoop, crouch, or crawl. (<u>Id.</u> at 43.)

**Medical and Other Records Before the ALJ**

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from health care providers, and an assessment by a non-medical consultant of his residual functional capacity.

When applying for DIB, Plaintiff completed a Disability Report. (<u>Id.</u> at 115-24.) A bad back limits his ability to work by restricting the amount of weight he can lift. (<u>Id.</u> at 116.) This first bothered him on October 15, 2006, and stopped him from working that same day because he could no longer do the job. (<u>Id.</u>) He had worked as a painter's helper at an auto body shop from 2001 to October 2006. (<u>Id.</u> at 117.) This job required that each day he walk three hours, stand seven, sit one, stoop seven, kneel six, crouch six, and crawl two. (<u>Id.</u>) He had to reach and to use his hands to grab or grasp big objects for eight hours each. (<u>Id.</u>) The heaviest weight he lifted was 300 pounds. (<u>Id.</u>) He frequently lifted 20 pounds. (<u>Id.</u>) He takes azithromycin for pneumonia and Ibuprofen and OxyContin for pain; the latter causes drowsiness. (<u>Id.</u> at 122.)

Plaintiff reported on a Missouri Supplemental Questionnaire that he uses a cane. (<u>Id.</u> at 148.) He does not do any household chores with the exception of making the bed and vacuuming and sweeping in small stages. (<u>Id.</u> at 150.) His wife does all the cooking and shopping. (<u>Id.</u>) His wife helps him wash his hair and his lower body and helps him put on

his shoes and socks and take off his pants and shirt.  (Id. at 151.)  He can watch an hour television program, but not a two-hour one.  (Id.)  He can play video games or use the computer for ten to fifteen minutes once a week.  (Id. at 152.)  The pain medication makes it hard for him to think straight.  (Id. at 153.)  Sometimes, things have to be explained to him several times.  (Id.)  His wife read the questionnaire questions to him and wrote down his responses.  (Id. at 154.)

An earnings record for Plaintiff indicated employment for the years 1996 though 2006, inclusive.  (Id. at 100.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his application.  (Id. at 158-64.)  Since January 2008, he has had pain in his lower back that makes it "[h]arder for him to do morning duties and stretch."  (Id. at 159.)  His medications now include Naproxen and propoxyphene for back pain.  (Id. at 161.)  The former causes stomach aches.  (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin in November 2004 when Plaintiff consulted a chiropractor about a sharp pain his lower back.  (Id. at 176-77, 179.)  He had had a similar condition in the past.  (Id. at 176.)  The pain made it difficult for him to sit, walk, bend, lie down, and lift.  (Id.)  It was a sharp, aching, throbbing, tingling, and cramping pain that interfered with his sleep, work, daily routine, and recreation.  (Id.)

Plaintiff consulted Bruce J. Berwald, M.D.,[4] on June 13, 2005, about pain in his left foot for the past two weeks.  (Id. at 284.)  He was worried that it was gout.  (Id.)  It was not. (Id.)

On June 28, 2006, Plaintiff saw the chiropractor for his complaints of low back pain that varied in intensity but was always present.  (Id. at 181.)  His job required a lot of bending.  (Id.)

Plaintiff complained to the chiropractor on July 25 of back pain that radiated from his lower back to his upper back.  (Id. at 181.)  He described the onset of the pain as insidious and denied any trauma or change in his daily activities.  (Id.)  Moving his neck, driving, and lifting all made the pain worse.  (Id.)  He had not taken any pain medication, but was using ice and heat.  (Id.)

Plaintiff returned to the chiropractor on November 6 with complaints of pain that had begun when he bent over at work.  (Id. at 179.)  It was recommended that he take time off work; however, he reported six days later that he felt compelled to work.  (Id.)  He was trying to take it easy.  (Id.)  The pain was worse with walking.  (Id.)  Three days later, he reported that he had felt some improvement, but that was followed by a worsening of the pain.  (Id.)

Plaintiff went to the St. John's Mercy Medical Center (St. John's) emergency room on November 13 complaining of back pain for the past couple weeks. (Id. at 242-47.)  The pain had become so intense that he almost fell.  (Id. at 243.)  It radiated to his right leg.  (Id.)  He

---

[4]Unless otherwise indicated, future references to Dr. Berwald are to Bruce Berwald.

explained that he had been seeing a chiropractor but had not had any relief.  (Id.)  Plaintiff was treated with pain medication and released.  (Id.)

He saw Dr. Berwald the next day for severe low back pain.  (Id. at 283.)  He reported that the pain medication given him at the emergency room helped; the medication was continued.  (Id.)

On November 16, the chiropractor noted that Plaintiff had gone to the emergency room after falling twice at work.  (Id. at 179.)

That same day, a magnetic resonance imaging (MRI) of Plaintiff's lumbar spine revealed a moderate size right-sided herniated disc at L5-S1 producing extradural compression on the S1 nerve root sheath, disc degeneration, and disc desiccation, and mild disc degeneration and disc desiccation at L4-L5.  (Id. at 172, 184.)

Plaintiff consulted William W. Sprich, M.D., the next day for his complaints of low back pain with right leg radiculopathy.  (Id. at 271-72.)  He reported that he did not have any specific injury, but did a lot of bending and stooping in his job as a painter's assistant in an auto body shop.  (Id. at 271.)  He had had similar symptoms six to eight months earlier that had resolved after conservative treatment.  (Id.)  He was now in severe pain and had recently gone to an emergency room and been treated with narcotics.  (Id.)  His pain increased with coughing or sneezing and was partially relieved by lying down.  (Id.)  On examination, he had significant lumbosacral spasm and tenderness.  (Id. at 272.)  He had ninety degrees forward flexion, ten degrees right and left bending, and ten degrees extension.  (Id.)  Straight

leg raises were negative bilaterally at sixty degrees.[5] (Id.) Dr. Sprich concluded that Plaintiff had "probably suffered an annular tear at L5-S1 and/or at L4-L5" with "resulting L5 radiculopathy on the right-hand side." (Id.) He noted that Plaintiff had had the condition for six weeks at most and had "not had a course of significant conservative treatment." (Id.) Plaintiff was to begin a course of epidural blocks and to add Lyrica, a pain medication, to his current regimen of medications. (Id.) If he improved, he was to have goal-directed physical therapy. (Id.) If he did not, further investigation would be required. (Id.) Dr. Sprich thought the second option was unlikely. (Id.) He wrote Plaintiff a note to remain off work until he had had a series of lumbar blocks. (Id. at 185.)

A week later, Plaintiff was admitted to St. John's with complaints of chest pain, shortness of breath, and a cough. (Id. at 190-241.) His medical history included chronic low back pain with herniated disc. (Id. at 193, 196.) He was diagnosed with left lower lobe pneumonia, given oxygen, treated with antibiotics, and discharged after six days. (Id. at 191-92, 194, 202, 205, 232-33.) When Plaintiff followed-up with Dr. Berwald, on December 5, he reported that his pneumonia was much improved. (Id. at 282.)

Plaintiff consulted Richard Gahn, M.D., with Advanced Pain Control on December 15 about his back pain. (Id. at 348.) He described it as radiating across his back and into his right lower extremity towards his thigh and calf. (Id.) The pain was constant but aggravated

---

[5]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

by sneezing, coughing, and prolonged activity or sitting. (<u>Id.</u>) It occasionally was better at rest and intermittently woke him at night. (<u>Id.</u>) He also had intermittent tingling in his right thigh and calf and occasional weakness. (<u>Id.</u>) He was taking Lyrica, Valium, Vicoprofen, and Elavil. (<u>Id.</u>) On examination, he walked with an antalgic gait and used a cane. (<u>Id.</u>) He could rise on both heels and toes. (<u>Id.</u>) With straight leg raises on the right, he had increased low back and right leg pain at about 45 degrees. (<u>Id.</u>) Patrick's test was negative bilaterally.[6] (<u>Id.</u>) He had some myofascial tenderness in his right gluteus medius muscle. (<u>Id.</u>) Dr. Gahn administered an lumbar epidural steroid injection. (<u>Id.</u>)

Plaintiff returned to Dr. Gahn on January 3, 2007, for another injection, reporting that his pain had been less severe following the first injection. (<u>Id.</u> at 349.) He had no numbness, tingling, or weakness. (<u>Id.</u>) He was alert and oriented. (<u>Id.</u>) His sensory exam was unchanged; however, he had a palpable myofascial cord in the left gluteus maximus muscle. (<u>Id.</u>) Two weeks later, Plaintiff had a third lumbar epidural steroid injection. (<u>Id.</u> at 253-54.) He was to follow-up as needed. (<u>Id.</u> at 254.)

Eight days later, he returned to Dr. Sprich, reporting a combination of back pain and leg pain that continued despite a series of three epidural blocks. (<u>Id.</u> at 270.) Dr. Sprich gave him two options: (1) "live with it" or (2) undergo either a microlumbar discectomy, probably

---

[6]The Patrick's Test is used to determine the presence of sacroiliac joint dysfunction in patients with lower back pain and performed by flexing the patient's leg so that the foot of the tested leg is on the opposite knee. John R. Schultz, M.D., <u>Patrick's Test: Evaluation of Sacroiliac Joint Dysfunction</u>, http://stemcelldoc.wordpress.com/2009/03/30/patricks-test-evaluation-of-sacroiliac-joint-dysfunction/ (last visited Sept. 15, 2011). It is positive if the test produces pain in the hip or sacral joint or if the leg cannot be lowered to the point of being parallel to the opposite leg. <u>Id.</u>

at L5-S1 and perhaps also at L4-L5, "and/or an anterior lumbar interbody instrumentation and fusion procedure." (<u>Id.</u>) Dr. Sprich favored the first proposed surgical intervention. (<u>Id.</u>) Plaintiff was to think it over. (<u>Id.</u>)

The same day, Plaintiff told Dr. Berwald that the injections had made his pain bearable on some days; however, it was still hard for him to sleep. (<u>Id.</u> at 281.)

Plaintiff choose the discectomy. He had the procedure on January 30, following which a diagnosis of a herniated disk at L4-5 and at L5-S1 was confirmed. (<u>Id.</u> at 263-69, 274-76, 340-43, 350-55.) The nurse practitioner in Dr. Sprich's office noted the next day that Plaintiff was tender and had "painful walking." (<u>Id.</u> at 259.) Three days later, he described Plaintiff as doing well, denying leg pain, numbness, or tingling, and having generalized tenderness around the incision site. (<u>Id.</u>)

Plaintiff returned to Dr. Sprich's office on March 2 for a follow-up visit. (<u>Id.</u> at 262, 278, 347.) An x-ray of his lumbar spine was negative. (<u>Id.</u> at 278, 347.) The nurse practitioner described him as "doing really well." (<u>Id.</u> at 262.) Plaintiff denied any low back pain or leg pain. (<u>Id.</u>) He was not taking any narcotic pain medication, and was taking over-the-counter medication as needed. (<u>Id.</u>) He still had some muscle pain and some stiffness and soreness when getting up in the morning. (<u>Id.</u>) The amount of sleep he was getting varied between a full night's sleep and two hours. (<u>Id.</u>) He was prescribed Flexeril. (<u>Id.</u>) He was continuing to wear a brace and told he could for comfort. (<u>Id.</u>) He was to start physical therapy and was to wait until the end of the four-week course before contemplating

returning to work. (Id.) The nurse practitioner noted that Plaintiff was considering changing his line of work or returning to school. (Id.)

Plaintiff began physical therapy on March 7. (Id. at 300-03.) He rated his pain as intermittently a four on a ten-point scale. (Id. at 302.) His short term goals were to decrease his pain to a two on a ten-point scale, increase his endurance for at least ten minutes of activity, and increase the strength in his right lower extremity. (Id. at 301.) His long term goals were to have a full range of motion, to further increase his strength, and to increase his endurance for activity lasting at least twenty minutes. (Id.)

Plaintiff had physical therapy sessions on March 7, March 12, March 15, March 19, March 21, March 26, March 28, April 3, April 5, April 9, April 11, April 17, April 24, May 15, May 17, May 22, May 24, May 29, June 5, June 12, June 14, June 19, June 20, June 26, June 28, and July 3. (Id. at 304-08, 310-15, 316-17, 319-24, 326, 328-33.)

At the fourth session, Plaintiff reported that his pain had increased from a three to a four. (Id. at 306.) He was wearing a brace only when in the car. (Id.) After the fifth session, he reported being sore and fatigued following the last one. (Id. at 307.) His pain remained a two. (Id.) He had 4/5 strength in each hip. (Id.) At the next, sixth session, Plaintiff reported that his pain was a three. (Id. at 308.) He had pain and fatigue from prolonged sitting. His short-term goals had been achieved. (Id.) He was to continue physical therapy in order to achieve his long-term goals. (Id.) Plaintiff's pain had increased to a four at the March 28 session and then decreased to a three at the following session. (Id. at 310, 311.) His strength was increasing and he was handling new exercises well. (Id. at

311.)  At the ninth session, his pain was a two.  (Id. at 312.)  At the April 11 session, Plaintiff

had pain in his low back and a decrease in stability when lifting, pushing, and pulling.  (Id.

at 314.)  The pain had increased to a three at the next session.  (Id. at 315.)

After the April 17 session, the physical therapist informed Drs. Sprich and Berwald

that Plaintiff was "[a]ble to demonstrate home exercise program independently."  (Id. at 316.)

His strength had increased to, at worst, 4/5.  (Id.)  His endurance had increased to at least ten

minutes of activities.  (Id.)  He complained of fatigue after "[a]ctivities of daily living."  (Id.)

His range of motion had increased to 75% of the trunk, except for lateral bending at 50%.

(Id.)  He had a good pacing with gait to a negative deviation.  (Id.)  He could tolerably lift

forty pounds from floor to waist and thirty-five pounds waist to overhead.  (Id.)  Straight leg

raises were negative.  (Id.)  The therapist recommended therapy be continued. (Id.)

Plaintiff's pain had increased to a five after the May 29 session and then decreased to

a four at the following session.  (Id. at 323-24.)

After the June 12 session, the physical therapist informed Drs. Sprich and Berwald

that Plaintiff had increased his endurance to at least thirty minutes with decreased pain and

had increased his independence with activities of daily living from 68% to 72%.  (Id. at 327.)

He recommended that Plaintiff continue with physical therapy.  (Id.)

Plaintiff's pain was again a two or three at the June 20 session.  (Id. at 330.)  He was

able to increase the amount of weight he could push or pull.  (Id.)  Plaintiff was discharged

from physical therapy after his July 3 session.  (Id. at 334-35.)  He had met all his physical

therapy goals and reported an 85-90% improvement since his initial evaluation.  (Id. at 28,

334.)  The therapist wrote Drs. Sprich and Berwald that Plaintiff had stated he was ready to return to work.  (Id.)  The strength in his trunk and lower extremities was 5/5.  (Id.)  He could lift fifty pounds floor to waist and forty pounds overhead.  (Id.)

While participating in physical therapy, Plaintiff reported to the nurse practitioner at Dr. Sprich's office on March 28 that he was still having "quite a bit of low back pain."  (Id. at 261.)  The pain was a four, particularly in the morning.  (Id.)  It did not radiate down his legs, but did occasionally independently occur in the legs.  (Id.)  He had not gotten the Flexeril prescription filled.  (Id.)  He was to return after he had finished physical therapy and was to have a functional capacity evaluation.[7]  (Id.)

X-rays of Plaintiff's lumbar spine on April 4 revealed minimal scoliosis.  (Id. at 277, 345-46.)

After seeing the nurse practitioner at Dr. Sprich's office on July 9, Plaintiff was discharged from their care.  (Id. at 260.)  He still had a little low back pain, but was not on any pain medication.  (Id.)  He could ambulate without assistance.  (Id.)  He wanted to return to work and was released to do so with restrictions of no sitting or standing for longer than forty-five minutes without stretching.  (Id.)

Three weeks later, Dr. Berwald also released Plaintiff to return to work with the restrictions recommended by Dr. Sprich.  (Id. at 281.)

_____

[7]Later records indicate this evaluation was not performed because worker's compensation would not pay for it.

Plaintiff had an MRI of his lumbar spine on February 18, 2008.  (Id. at 365.)  This revealed (a) a "[r]ight laminotomy at L4-5 with mild to moderate epidural fibrosis in the lateral recess and surrounding the right L5 root" and (b) a right laminotomy at L5-S1 with "epidural fibrosis along the right lateral aspect of the sac and lateral recess adjacent to the S1 root."  (Id.)

On March 20, Plaintiff saw the nurse practitioner at Dr. Sprich's office.  (Id. at 391.)  He reported that he had been doing well, but had returned to work and was unable to lift anything heavier than twenty pounds.  (Id.)  For the past two months, he had been having right buttock pain that primarily radiated from his low back and stopped at that buttock.  (Id.)  The pain was intermittent and was a five.  (Id.)  He had tried to find other work, but nobody would hire him; consequently, he had applied for disability.  (Id.)

Plaintiff saw Dr. Berwald on March 31 for a cyst on his right eyelid.  (Id. at 364.)

The next day, Plaintiff returned to Dr. Gahn for a provocative lumbar discography[8] at L3-4, L4-5, and L5-S1.  (Id. at 367-69.)  The discography was positive at L4-5 and L5-S1 and negative at L3-4.  (Id. at 368.)  Subsequently, on May 7, Plaintiff underwent a "[r]adical anterior lumbar diskectomy, endoscopic diskectomy [at] L4-5, L5-S1, autologous station fusion, L4-5, L5-S1, with anterior plate fixation stabilization, L4-5, L5-S1 . . . ."  (Id. at 371-89.)  Two days later, he called Dr. Sprich and reported that the Vicodin did not help; oxycodone was prescribed.  (Id. at 396.)  When a follow-up call was placed to Plaintiff on

---

[8]A provocative discography "is an imaging-guided procedure in which a contrast agent is injected into the nucleus pulposus of the disc."  Biomedical Imaging and Intervention Journal, Provocative discography:  current status, http://biij.org/2005/1/e2/ (last visited Sept. 14, 2011).

May 12, Plaintiff stated that he was doing well overall.  (Id.)  He had some left leg pain as a result of the bone marrow aspiration.  (Id.)  He was wearing a brace and using his bone stimulator.  (Id.)

A x-ray taken the next day of his lumbar spine showed no visible changes.  (Id. at 392.)  The anterior fusion of L4-5 and L5-S1 was unchanged; there was no subluxation[9] or fracture.  (Id.)

Plaintiff telephoned Dr. Sprich's office again on May 20, complaining of sharp, intermittent leg pain that was usually a three and was a seven at most.  (Id. at 396.)  His muscles were stiff in the morning.  (Id.)  He was taking Percocet and Vicodin, and was given a refill of Vicodin and additional prescriptions for Elavil and Flexeril.  (Id.)  It was noted that it was too early for a refill of his Percocet prescription.  (Id.)

Plaintiff reported to Dr. David Berwald on June 5 that he had had back surgery a month earlier and had been doing well until recently when he had begun to be depressed.  (Id. at 364.)  He was continued on his current medications, including Flexeril, Vicodin, Percocet, and amitriptyline, and also prescribed Zoloft.  (Id.)  He did not keep his next, July appointment.  (Id.)

Plaintiff returned to Dr. Sprich's office on June 13 for his first post-operative visit.  (Id. at 393.)  He was using his brace, bone stimulator, and cane.  (Id.)  He continued to have

---

[9]Subluxation is "[a]n incomplete . . . dislocation."  Stedman's Medical Dictionary, 1693 (26th ed. 1995).

dysesthesia[10] in his left lower extremity.  (Id.)  On examination, he had good strength in his quadriceps, equal bilateral strength and sensation in plantar extension and flexion, bilateral lower extremity mobility, and "an apprehensive and somewhat guarded limited range of motion . . . in his lumbar sacral area."  (Id.)  He had minimal tenderness on palpation of the paraspinal region and no spasm.  (Id.)  There was minimal dysesthesia on the left lower extremity from the foot to the mid-calf.  (Id.)  The oxycodone prescription was discontinued, and he was to be weaned from Vicodin, his brace, and the use of the bone stimulator.  (Id.)  He was to start physical therapy.  (Id.)

On a second post-operative visit to Dr. Sprich's office on July 25, Plaintiff was cautioned about the effect of his smoking tobacco on his post-surgery bone growth.  (Id. at 394, 398.)  He had a "grossly normal motor, sensory, and reflex examination of the bilateral lower extremities" and a stable gait.  (Id. at 394.)  His pain perception and functioning had improved.  (Id.)  X-rays of his lumbar spine revealed no significant change.  (Id. at 398.)  He was follow up with his home exercise plan according to physical therapy and to return in six months for a CT scan.  (Id. at 394.)

Subsequently, in October, a CT scan of his lumbar spine was done.  (Id. at 399.)  Again, there were no significant changes.  (Id.)

Plaintiff consulted Dr. David Berwald in December, explaining that he had done well when taking Zoloft, had discontinued it because he thought he no longer needed it, and was now again depressed.  (Id. at 401-02.)  He was restarted on the Zoloft.  (Id.)  The dosage of

---

[10]Dysesthesia is "[i]mpairment of sensation short of anesthesia."  Id. at 531.

Zoloft was increased from 50 milligrams to 75 in March 2009 when Plaintiff reported he was improving but continued to occasionally feel "moderately depressed." (Id. at 402.)  In May, Plaintiff reported that he was doing well on the 75 milligrams of Zoloft, but sometimes had insomnia.  (Id. at 403.)  He was prescribed a medication for that.  (Id.)

While consulting Dr. Berwald for depression, Plaintiff returned to Dr. Sprich for a consultation on January 21.  (Id. at 413.)  He had primarily low back pain and was unable to do heavy lifting, bending, or anything more than light household chores.  (Id.)  He had a normal gait and station; "good power proximally at the hip flexors, extensors and quadriceps"; and uncompromised distal strength.  (Id.)  Dr. Sprich opined that he was at maximum medical improvement.  (Id.)  His functional capacity was "probably as good as it's going to get."  (Id.)

On June 16, Plaintiff reported to the nurse practitioner at Dr. Sprich's office that he could stand for no longer than twenty minutes before experiencing "tremendous back pain" radiating to his legs.  (Id. at 417.)  On palpation, he had some muscle spasms in his paraspinou muscles.  (Id.)  He had good strength in his lower extremities and discomfort when his leg was raised.  (Id.)  The practitioner declined to describe it as a positive straight leg raise on either side.  (Id.)  He was scheduled for an electromyogram (EMG) and a nerve conduction study.  (Id. at 417, 427.)  He could not tolerate the nerve conduction study.  (Id.)  "There [were] no acute abnormal EMG findings . . . ."  (Id.)

Plaintiff had a CT scan and a myelogram of his lumbar spine in July.  (Id. at 404-06, 428-30.)  This revealed "[u]ncomplicated stable postsurgical changes of previous anterior

diskectomy and fusion at L4-5 and L5-S1 levels." (<u>Id.</u> at 404, 428.) A prior x-ray, taken the previous January, had shown a mild curvature of the spine measuring less than ten degrees and no subluxations. (<u>Id.</u> at 423.)

Following the myelogram, Dr. Sprich wanted Plaintiff to be seen by another doctor in his office, Robert E. Schultz, Sr., M.D. (<u>Id.</u> at 411.)

Plaintiff consulted Dr. Schultz on September 2. (<u>Id.</u> at 419-20.) He reported that he still had "very significant back pain," worse on the left than on the right, and his leg pain had improved, although he still had posterior thigh pain. (<u>Id.</u> at 419.) He was most uncomfortable when sitting. (<u>Id.</u>) His feet always felt numb, but not painful. (<u>Id.</u>) Standing or lying down gave him some relief. (<u>Id.</u>) On examination, he had flexion of his lumbar spine of fifteen to thirty degrees, extension of zero to fifteen, and lateral bending to either side of ten degrees. (<u>Id.</u>) He had bilateral joint tenderness at S1 and bilateral sciatic notch tenderness, both worse on the left than on the right. (<u>Id.</u>) There was no atrophy, fasciculation, or deformity in either extremity. (<u>Id.</u>) Straight leg raises were positive at about thirty degrees bilaterally. (<u>Id.</u> at 420.) His station and gait were unremarkable. (<u>Id.</u>) His motor strength examination was non-focal. (<u>Id.</u>) Dr. Schultz' impression was of low back pain, sciatic left, and S1 joint dysfunction. (<u>Id.</u>) He noted that there was "no obvious lesion that could be regarded as causative for [Plaintiff's] continuing complaints." (<u>Id.</u>) He discussed spinal cord stimulation or pump implants for pain relief with Plaintiff. (<u>Id.</u>) Plaintiff was to return in approximately two weeks. (<u>Id.</u>)

The day before, Plaintiff saw Dr. Berwald to discuss his medications and disability. (Id. at 434.) His insomnia was better. (Id.) He was still taking Vicodin for his chronic back pain. (Id.) His prescription for Zoloft was renewed. (Id.)

Dr. Sprich noted on September 8:

Apparently, some questions have been brought up as to what this patient's problem was. The patient suffered lumbar disc disease at L54-5 and L5-S1 and underwent two-level interbody instrumentation and fusion. . . .

His neurologic exam, at this particular point, is intact. He has no sign of mechanical failure of the instrumentation or the hardware. His limitations are secondary to discomfort. He is unable to do repetitive bending or stooping. He is unable to carry more than 20 pounds, infrequently, more than 10 pounds. Frequently, he is not allowed to do pushing and pulling. He has to change positions approximately every 45 minutes to 1 hour from either the sitting or the standing position. At this point, that is not likely to change. . . .

(Id. at 432.)

The following week, Dr. David Berwald wrote that Plaintiff had been a patient of Berwald Surgical-Medical, Inc., since June 2005 and has "long standing back pain." (Id. at 433.) He continues to complain of such pain and of depression and insomnia. (Id.) The pain caused by prolonged standing and lifting prevents him from working. (Id.)

Also before the ALJ was a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff completed in February 2008 by an agency non-medical consultant. (Id. at 356-61.) The primary, and only, diagnosis was degenerative disc disease of the lumbar spine. (Id. at 356.) This impairment resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, walk, or sit about six hours in an eight-hour day. (Id. at 357.) He had postural limitations

of never climbing ladders, ropes, or scaffolds; only occasionally climbing ramps and stairs, stooping, crouching and crawling; and no more frequently than two-thirds of the time balancing or kneeling.  (Id. at 359.)  He had no manipulative, visual, communicative, or environmental limitations.  (Id. at 359-60.)

### The ALJ's Decision

Analyzing Plaintiff's application pursuant to the Commissioner's sequential evaluation process, the ALJ first found that Plaintiff met the insured status requirement through December 31, 2012, and had not engaged in substantial gainful activity since his alleged onset date of October 15, 2006.  (Id. at 12-13.)

The ALJ next found that Plaintiff had "'severe'" impairments of degenerative disc disease and depression.  (Id. at 13.)  Although Plaintiff had a history of chest pain and shortness of breath and had been treated for pneumonia, there were no consequential long-term limitations to his residual functional capacity (RFC).  (Id.)  Thus, neither the chest pain nor the shortness of breath had more than a minimal effect on his ability to perform work-related functions; consequently, neither was severe.  (Id. at 13-14.)

The severe impairments Plaintiff did have did not, singly or in combination, meet or equal an impairment of listing-level severity.  (Id. at 14.)  Specifically, his degenerative disc disease did not meet Listing 1.04 for a spinal disorder because there was no evidence of nerve root compression, spinal arachmoiditis, or pseudo-claudication of the lumbar spine resulting in an inability to ambulate effectively.  (Id.)  His depression did not cause the necessary degree of limitation in functioning because the records did not indicate they were severe

enough to result in regular treatment from a mental health specialist or in inpatient treatment. (Id.) He indicated he was doing well when taking Zoloft and Xanax in May 2009. (Id.) The ALJ further found that Plaintiff's mental impairments caused no restrictions in his daily living activities, no difficulties in social functioning, and only moderate difficulties in concentration, persistence, or pace. (Id.) And, he had had no episodes of decompensation. (Id.)

Addressing the question of Plaintiff's RFC, the ALJ found that his impairments precluded him from lifting and carrying more than ten pounds frequently and twenty pounds occasionally; standing, sitting, and walking more than six hours out of an eight hour day; climbing ropes, ladders, or scaffolds; being exposed to a concentrated degree to industrial hazards, unprotected heights, or excessive vibration; and more than occasionally climbing ramps and stairs, balancing, stooping, crouching, kneeling, crawling, or climbing ladders, ropes, or scaffolds. (Id. at 15.) Also, Plaintiff needed to be allowed to rotate positions frequently and was limited to unskilled work. (Id.)

In reaching his conclusions about Plaintiff's RFC, the ALJ reviewed Plaintiff's testimony and the other evidence of record. (Id. at 15-19.) The ALJ noted the discrepancy between Plaintiff's alleged disability onset date in October 2006 and the November 2006 MRI indicating a right-side herniated disc and mild disc degeneration at L4-5. (Id. at 16.) He next noted that the objective records following Plaintiff's January 2007 surgery did not indicate the presence of significant ongoing impairments, nor did the physical therapy records. (Id.) Rather, those records indicated a significant improvement in Plaintiff's back pain and an

ability to lift fifty pounds.  (Id.)  Additionally, the records subsequent to Plaintiff's second spinal surgery indicated that his spinal impairments had improved.  (Id. at 17.)  For instance, the June 2008 lumbar spine x-rays showed the fusion was unchanged and there was no subluxation or fracture.  (Id.)  Subsequent records from Dr. Sprich's office also did not indicate significant and ongoing spinal limitations.  (Id.)  Those records did indicate that Plaintiff's alignment was stable and he had no loosening of his hardware.  (Id. at 17-18.)

Dr. David Berwald's opinion that Plaintiff was unable to work was contradicted by an earlier report of Dr. Sprich and was unpersuasive because (a) it was conclusory, (b) either Dr. Berwald was Plaintiff's primary care physician and not an orthopedist, and (c) the limitations noted by Dr. David Berwald were contradicted by records from other specialists.  (Id. at 18.)

The ALJ considered Plaintiff's daily activities – specifically, his caring for his young son – to "underscore[ ] a capacity that exceeds that to which [Plaintiff] testified."  (Id.)  Also, Plaintiff had filed for and received unemployment benefits after his alleged disability onset date, thereby presenting himself as "ready, willing, and able to work."  (Id. at 18-19.)

With his RFC, Plaintiff could not return to his past relevant work.  (Id. at 19.)

With his education, age, and RFC, he could perform jobs that existed in significant numbers in the national economy.  (Id.)  For instance, as the VE testified, he could perform the requirements of such jobs as file clerk, retail sales clerk, and security guard.  (Id. at 20.)  Therefore, he was not disabled within the meaning of the Act.  (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in

the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)) (second alteration in original).

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v.

Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524).  After considering these factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 404.1520(f).  The Commissioner may meet

this burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions

represents the ALJ's findings, the court must affirm the ALJ's decision." **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789). <u>See also</u> **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

<u>Discussion</u>

Plaintiff argues that the ALJ failed to properly assess his RFC and, therefore to ask the VE a hypothetical question that included all the concrete consequences of his impairments. The Commissioner disagrees.

As noted above, an RFC must be "'based on *all* the relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of [his] limitations.'" **Jones**, 619 F.3d at 971 (quoting <u>Page v. Astrue</u>, 484 F.3d 10410, 1043 (8th Cir. 2007)) (emphasis added). Thus, there must be "'at least some' medical evidence [to] support the ALJ's RFC determination." **Wildman v. Astrue**, 596 F.3d 959, 969 (8th Cir. 2010) (citing <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001)).

Plaintiff focuses his argument that the ALJ's RFC finding was not supported by sufficient medical evidence on the ALJ's decision to give more weight to the findings of Dr. Sprich than to the conclusion of Dr. David Berwald that Plaintiff's pain caused by prolonged standing and sitting prevented him from working. Plaintiff contends that Dr. Berwald's opinion should have been given the greater weight because he is Plaintiff's treating physician. The Court disagrees.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)).

Title 20 C.F.R. § 404.1527(d) lists six factors to be evaluated when weighing opinions of treating physicians: (1) the examining relationship; (2) the treatment relationship, including the length of the relationship, the frequency of examination, and the nature and extent of the relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(1)-(6). Consideration of these factors militates against giving Dr. David Berwald's assessment controlling weight.

First, Plaintiff was primarily treated by Dr. *Bruce* Berwald. The notes of his treatment are cursory. For instance, the form for the notes of each visit includes a checklist for whether the examination of Plaintiff's various systems, e.g., neurological, and parts, e.g., skin, is

within normal limits or is abnormal. This checklist is not always marked, and, when it is, only some of the items are checked and those that are are always marked as being within normal limits. Indeed, the checklist for the visit when Dr. David Berwald prescribed Zoloft for Plaintiff has no marks on the checklist, including that for psychological systems. Rather, each office note includes Plaintiff's complaints and the list of drugs prescribed. It is permissible for an ALJ to discount an assessment of a treating physician that consists of conclusory statements. See **Wildman**, 596 F.3d at 964. See also **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements.").

Second, Dr. Berwald's opinion about Plaintiff's pain is not supported by anything other than Plaintiff's complaints.[11] There is no evidence that either Dr. Berwald reviewed any of Plaintiff's medical records other than the reports from the physical therapist, including Dr. Sprich's notes or the results of the various diagnostic tests. See **Gates v. Astrue**, 627 F.3d 1080, 1082 (8th Cir. 2010) (rejecting argument that ALJ erred in assessing claimant's mental impairments when medical opinion cited by claimant was "largely based" on her own statements); accord **Wildman**, 596 F.3d at 967; **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007).

---

[11]The Court notes, as did the Commissioner, that Plaintiff does not challenge the ALJ's credibility determination.

Third, neither Dr. Berwald is a specialist. Generally, greater weight is to be given "'to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.'" **Hinchey v. Shalala**, 29 F.3d 428, 432 (8th Cir. 1994) (quoting 20 C.F.R. § 416.927(d)(5)); accord **Hensley v. Barnhart**, 352 F.3d 353, 356 (8th Cir. 2003) (citing, inter alia, 20 C.F.R. § 404.1527(d)(5)); **Kelley v. Callahan**, 133 F.3d 583, 589 (8th Cir. 1998). The records of Dr. Sprich, who was Plaintiff's treating specialist, consistently refer to Plaintiff having, after the second surgery, a normal gait and station, no atrophy, and muscle strength in his lower extremities. These findings undermine Plaintiff's claim of such pain on standing that he is prevented from working.

The ALJ cited the foregoing considerations when explaining his decision not to give Dr. Berwald's opinion greater weight. This was a sufficient rationale to support that decision.

Plaintiff argues, however, that the ALJ's error in not giving Dr. Berwald's opinion the appropriate weight is attributable to his failure to fully and fairly develop the record. "A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." **Ellis v. Barnhart**, 392 F.3d 988, 994 (8th Cir. 2005). "Where 'the ALJ's determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations,' the claimant has received a 'full and fair hearing.'" **Jones**, 619 F.3d at 969 (quoting Halverson, 600 F.3d at 933). Thus, "[t]he ALJ does not 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'" **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting Stormo v. Barnhart, 377 F.3d

801, 806 (8th Cir. 2004)).  A crucial issue was not undeveloped in the instant case; rather, it was resolved unfavorably to Plaintiff.  See e.g. **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008) (finding that claimant's failure to provide medical evidence supporting her allegations of work limitations "should not be held against the ALJ when there *is* medical evidence that supports the ALJ's decision"); **Samons v. Astrue**, 497 F.3d 813, 819 (8th Cir. 2007) (finding ALJ need not have contacted claimant's treating physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable).

Plaintiff further argues that the ALJ erred by not giving greater weight to the necessity of a second fusion surgery and to Dr. Sprich's January 2009 note that Plaintiff was unable to do any heavy lifting or bending or anything more than light household chores.  The necessity alone of a second surgery does not require a finding of disability.  And, the notation is clearly based on Plaintiff's complaint.  It appears in the section titled "Interval History."  In the section titled "Physical Exam," Dr. Sprich observed that Plaintiff's gait and station were normal and he had good power at the hip flexors, extensors, and quadriceps.  Dr. Sprich did not observe any functional restriction that would support Plaintiff's described limitations. Plaintiff mistakenly cites this note as including a conclusion that he was not able to stand or walk for long periods of time.  It does not.  Six months later, Plaintiff reported to the nurse practitioner in Dr. Sprich's office that he could not stand for longer than twenty minutes. Again, on examination, he had good strength in his lower extremities.  Although he also had discomfort on straight leg raises, the nurse practitioner declined to describe it as a positive

response. Three months later, Plaintiff informed Dr. Schultz that standing gave him relief from back pain. He had no atrophy in his lower extremities and a normal gait and station. Thus, the record does not support Plaintiff's contention that Dr. Sprich found Plaintiff to be unable to sit or walk for long periods.

Citing Drs. Berwald and Sprich's opinions, Plaintiff next argues that the ALJ erred by not including in his hypothetical to the VE the concrete consequences of his impairments. A properly phrased hypothetical question to a VE must "capture the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997); accord **Robson v. Astrue**, 526 F.3d389, 392 (8th Cir. 2008). "A hypothetical question is properly formulated[, however,] if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Accord **Goff**, 421 F.3d at 794; **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999). Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question. **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001). For the reasons set forth above, the ALJ's hypothetical questions properly included only the concrete consequences of the impairments found to be supported.

Plaintiff notes that the ALJ failed to explain "why someone who has had two back surgeries in less than 18 months does not qualify for Disability benefits." (Pl. Brief at 18.) The two surgeries alone do not satisfy the criteria for the listing for "disorders of the spine." See 20 C.F.R. pt. 404, subpt. P, app.1, § 1.04. Moreover, it is Plaintiff's burden of persuasion

to prove disability, not the ALJ's to prove the opposite. See **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011); **Vossen**, 612 F.3d at 1016.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of September, 2011.